The Honorable The United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honorable Court may give their attendance and they shall be heard. God save the United States of America and this Honorable Court. Court is in session. Today's cases will be called as previously announced and the times will be as allotted to counsel. The first case today is United States v. Praneeth Manubolu, Appeal No. 20-1871. Attorney Lopez, please introduce yourself for the record and proceed with your argument. Good morning, Julia Lopez on behalf of the United States. If I may, I would like to reserve three minutes of my time for rebuttal. You may, and good morning. Good morning, thank you. The purpose of the exigency rule is to resolve what the Supreme Court referred to in the Mitchell case as grim dilemmas. The officers responding to the accident scene in this case faced just such a grim dilemma. On the one hand, they confronted a horrific accident that brought with it a slew of urgent safety and investigative needs. It was 3 a.m. in a remote area, the car was crushed, the driver needed to go to the hospital for medical treatment, and the officers quickly determined that they were investigating the scene of a potential triple homicide. Ms. Lopez, could you clarify, please, if you're arguing that the judge clearly erred in his fact-finding or if you're arguing that the court misapplied the law to the facts as found? The latter, Your Honor. We are arguing that the district court's analysis of the totality of the circumstances here and its conclusion that there was no exigency was erroneous as a matter of law. We don't agree, excuse me, we don't disagree with the underlying factual findings, but we do disagree with the way the court balanced those various facts and its conclusion about the totality of the circumstances here. So the critical question in a case like this after Mitchell is when blood alcohol evidence is dissipating, are there other pressing needs that reasonably could take priority over a warrant application? In our view, that's a legal question, and the district court erred here when it concluded that there were not pressing needs that the officers reasonably could prioritize over drawing the defendant's blood. And for that reason, the results of that warrantless blood draw should not have been suppressed. And there are five critical points that I would like to address to the court today. The first is that this was a highly unusual case for the National Park Service. This was a unique set of circumstances type of investigation that the ranger testified he had never confronted and was not aware of the Park Service ever investigating a case like this. And I think that's important when considering the overall totality of the circumstances here. And, of course, it was a very serious case. The second critical point is that this defendant needed to go to the hospital for medical treatment. The district court's factual findings were that the officers did not want to divert him from the hospital for a breath test given the EMT's advice that he needed medical assessment. Well, the issue is not whether he needed to go to the hospital. The issue is the court's finding that under the totality of circumstances, it was reasonable if the system hadn't broken down for you to have gotten a warrant. That's correct, Your Honor, but I would suggest that the fact that he had to go to the hospital is one factor on this sort of balance of reasonableness. If you look in Mitchell, the court there talked about the fact that the drivers need to go to the hospital in that case because he was unconscious made it difficult or impossible, rather, for the police to get a breath test, and that that was one of the reasons that there was an exigency in that case. So it's an important... He went to the hospital, but he would not give consent to the blood test. That's correct, Your Honor. That's correct. And we don't argue that there was consent here, right? We're arguing that this was a permissible warrantless blood draw under the exigent circumstances analysis. We agree that there was no consent in this case. My point is that under Mitchell, what the Supreme Court said is that when a breath test... What's the exigent circumstance? The exigent circumstance, Your Honor, is that there were pressing investigative and safety needs that the officers reasonably prioritized over a warrant in this case. This was an incredibly serious accident. We know from the Supreme Court... Well, they tried to get a warrant. The system broke down. Well, Your Honor, I think it's important to separate out the state and the federal officers here because they're not actually interchangeable. And so what the record shows is that the state system, the officers testified, that it would have taken between 3 and 5 hours for them to get a warrant. So I'd submit under the facts of this case, and given the officer resources, the state warrant process was simply off the table. And there's no flaw in that warrant process. Even in McNeely, Justice Sotomayor's majority opinion in McNeely, the court... What about the federal warrant process? The federal warrant process, Your Honor, the record showed that that also would have taken a significant amount of time. And it is true that an assistant United States attorney did not pick up the phone. I would submit to the court that that is not an appropriate factor to take into account in this exigency analysis given that... Because there was nothing deliberate about the missing of a middle-of-the-night phone call, Your Honor. Under Kentucky v. King, the question is whether government officials have done something in violation of the Fourth Amendment that creates the exigency. That's not what happened in this case. It was the middle of the night, and AUSA, the record shows, simply didn't pick up the phone. But I would also point out that... It was the on-call AUSA. That's correct, Your Honor, but there's still nothing in the record to show that there was any sort of deliberate attempt to avoid procuring a warrant. Things happen in the middle of the night. There's nothing in the record to suggest exactly what happened here except that the phone was not picked up. But I think what's also important, Your Honor, is that even if the AUSA had picked up that phone call, the record shows that it still would not have been able to procure a warrant in a timely fashion here given the other exigencies of the situation. And if I may, just looking at the timeline here, the only federal officer on scene for the first approximately 90 minutes after the car crash was Ranger Dominey. He didn't even arrive on scene until 3.30, and he was alone, the sole federal officer on scene, until 4 or 4.15. So that's approximately 90 minutes after the accident even happens. It would not be reasonable for him to be required to leave the scene as the only federal officer overseeing this horrific crash investigation. So even if the AUSA had picked up at 3.15 when the call was first made, that doesn't mean that the officer could have left at that time to procure a warrant. The record shows exactly the opposite, and I would submit that it was reasonable given the exigencies of the situation and the need to investigate a serious crash that Ranger Dominey remained on scene as long as he did. May I ask a factual question that's not altogether clear from the record here? There was a blood draw done by the hospital for its clinical purposes. Was that the same blood draw, or was it a separate blood draw? When did it take place? And furthermore, do you need to get the warrant for your own blood draw when you already have a blood draw being done by the clinical people at the hospital? Yes, Your Honor. My understanding is that the hospital blood draw was a separate blood draw. I believe it was done around the same time as the police blood draw, though I'm not exactly positive on the timing there. If I may, just so I understand the chronology here, if there's suppression of the blood draw that's done at the direction of the federal agent, you still have available, do you not, the blood draw that was done by the hospital? That's correct, Your Honor. Okay. We actually did a warrant and procured that actual blood sample and then did a subpoena for the hospital's records, which showed the results of that blood alcohol test. What the record showed below, because the district court had asked about this, whether it needed to even resolve the question of suppression of the police blood test, is that both parties felt it did need to be resolved, in part because it's my understanding that the reliability of the hospital test is more subject to challenge than the reliability of the police test. Four minutes remaining. Given that it's not done in a way pursuant to the same police evidentiary standards. So it's our view that the police blood test is important to our case. It's a material fact. That's why we have sought the appeal. May I ask another maybe factual question? Why is it that the United States Attorney's Office or the government had set up this kind of Rube Goldberg machine that didn't work for notification? First, why did it take the involvement of three assistant United States attorneys finally to get this done? And second, why could the agents not contact the magistrate to judge directly? First, Your Honor, there's nothing in the record except I can say that it was the middle of the night and so phone calls were missed. That's why there's an on-call responsibility in the United States Attorney's Office. These people were on-call except they weren't? Again, Your Honor, I can't say except that it was the middle of the night and we don't have anything in the record as to why that phone call wasn't answered. But things happen. Calls are missed. Phones are put on silent accidentally. I don't know the reason, and I'm afraid I'm not able to answer that. Second question, that is, why is the magistrate judge not available to be contacted directly by the agents? Perhaps in the default of being able to get an assistant United States attorney in a timely fashion. Your Honor, what I can say is that that's not something that's entirely within the U.S. Attorney's Office's control. The warrant process is also something that is partly in the court's control, and so I'm not sure that, again, it's not entirely in the record as to why it was set up that way except that that is the process that's always existed as we have done it with the court. If I understand it, then there's some responsibility on the part of the court itself to make available its judicial officers, and they chose not to? I think there's been a preference that contact is through the U.S. Attorney's Office, Your Honor. And I guess what I would say, though, in terms of the warrant process is, and this is back to my point, this was a highly unusual circumstance. It's late at night, middle of the night, horrific accident. And if a warrant process works 99 times out of 100, but that hundredth time, it's not sufficient given the circumstances of whatever is being investigated, that that is the case for the exigency exception. And I would submit that that's what we have here. There's nothing in the record to suggest that this warrant process doesn't typically work. This was, again, late at night. Well, there's nothing in the record. I mean, you're arguing totality of circumstances, but there's a whole lot about the totality that simply was not – there's not a record made of what happened. We don't know why people didn't pick up – three people didn't pick up a phone. We don't know if there's an inherent problem with the system as it's set up. We just don't know. What we do know is – And just one more thing. And coming from the state court, I was awakened in the middle of the night, almost every night, to sign search warrants and arrest warrants. Yes, and I can appreciate that, Your Honor. Again, the process, it is what it is in the record. I can't – you know, I don't think – for example, there was a case cited in the athlete's brief from the District of Maryland where they have tons of OUI arrests, and so they have created a system where there's a magistrate on call 24-7. That's not to say that our judges are not available to us. It's just that, as I understand it, the preference has been that the calls go through the U.S. Attorney's Office. But what I think is important here is if we look at the totality of the circumstances here, this goes back to my point, even if the AUSA had answered that call at 315, there's one federal officer on scene for the first 90 minutes after the crash. And that's just the reality of the situation when we're talking about – What about state actors? There were three of them, Your Honor. One of them was engaged with the defendant the entire time, which I would submit was reasonable. The other two were assisting in the crashing investigation. And in any event, the district court credited their testimony that their warrant process Time has expired. would be three to five minutes, Your Honor, which I would suggest – or three to five hours, which I would suggest was too long under these circumstances. Let me ask you about that last point. It seems to me the exigency analysis depends upon two variables. One variable is how much time under the circumstances would it reasonably take to get a warrant, which you've addressed. But then the other variable is how much time would have to pass before one could get meaningful results that would allow you to project back an estimate of blood alcohol level at the time of the accident. And I found in the record no information about that second variable, which Judge Woodcock also noted. So if we don't have that second variable, if we don't know how much time you had within which to get a warrant, then what difference does it make how much time it would take to get a warrant? You're just missing a crucial piece of information. I have two responses, if I may, Your Honor. The first, as a factual matter, I would disagree with the fact that there's nothing in the record. Ranger Dominey did testify that he was considering this as an exigent circumstance, and he specifically pointed to the fact that he knew the local bars closed around 1 a.m., and so he was implicit in that is that he's doing a calculation in his mind about how long it has been since the defendant had his last drink. And by the time Ranger Dominey arrived on scene and developed probable cause as to indicators of impairment, we're talking almost three hours. And then I would pair that with what the Supreme Court has told us repeatedly about the dissipation of blood alcohol evidence. And I would focus the court on McNeely, where the court said for its purposes it wasn't significant exactly what the dissipation rate is, because that can change based on a variety of factors. And an officer arriving on an accident scene can't necessarily say with precision exactly what the dissipation rate will be in that case, but that any significant delay in testing is going to be problematic. And the longer you go, the less reliable the evidence gets. So, you know, in Mitchell it was 90 minutes, in Schmerber it was 2 hours. I would suggest that those are the periods of time we're talking about, and that significant delay beyond that point, the evidence becomes less and less reliable. Did anyone point out that alternative extra record source of information for that second variable to Judge Woodcock? I don't know if anyone directly cited that language from McNeely or Mitchell. It's been in Supreme Court opinions, and certainly he was aware of those opinions. He cited both of them in his decision. I don't want to take more of your time, but I do want to ask a question apropos of what Judge Kayade has asked about, so that your friend will be able to respond to it as well. But at page 36 of your blue brief, you say that by 7 a.m. it would have been almost certainly dissipated. Where is that supported in the record? What I can say, Your Honor, is that, and I didn't cite this in my brief, and I apologize for this, but the government did attach to its suppression motion below one of the police reports, and what that police report shows is that when the blood test was taken at 424, I believe it was, his blood alcohol level was .095. So already fairly close to the limit that we're dealing with here of .08. And I did not cite that in my brief, but it is in the publicly available record. I believe it's attachment one to docket number 44, and the district court's record is a police report showing the results of that blood test. But your expert would project back from that. That's correct, Your Honor, although even in McNeely, they talk about the fact that the longer you go, the less reliable that projection back gets. And so you're losing, and Mitchell talked about just how incredibly important and compelling this evidence is in enforcing DUI laws, and particularly here we have a triple manslaughter charge. The longer you go, the less reliable the evidence gets, and it's evidence of a critical fact. And the police are not entitled to prioritize other pressing needs, and they're not required under Mitchell or McNeely to wait for any sort of significant delay. McNeely talks about maybe a situation where you could get a warrant before you went to the hospital for the blood test, but any quote-unquote significant delay is not something that the police are required to abide. And I submit that the circumstances in this case, had they gone through the entire warrant process, there would have been a significant delay in the testing, and it would have impacted the evidence's reliability. Ms. Lopez, not to prolong this, but I have one more question. I didn't understand your response to Judge Woodlock's question about the blood draw from the hospital being less reliable. Why would it be less reliable? There's record in the evidence, Your Honor, and I believe that my opposing counsel agreed with this, that there's more ability to challenge the reliability of a hospital blood draw because it's not done pursuant to certain evidentiary standards that the police use when they draw blood. It's a hospital blood test. It's not done for the purpose of preserving evidence for a criminal proceeding. I don't know much of the detail beyond that, except that both parties agreed below that the foundation and reliability of that hospital blood test would be more subject to challenge than the police blood test. All right. Any additional questions from colleagues? Okay. Thank you. Thank you. Thank you, Attorney Lopez. Please mute your audio and video at this time. Attorney McKee, please unmute your audio and video, and you may proceed. Good morning. May it please the Court, my name is Walt McKee, and I represent Praneeth Menabolo. I think the government's argument here really ignores some key factual findings that were made by Judge Woodcock and that were supported by the record. First and foremost was that Mr. Menabolo's injuries were minor by his assessment and by the factual findings that there were multiple law enforcement officers and EMTs on the scene shortly after this accident took place. And then, of course, the warrant process and procedure that was needlessly cumbersome and which involved multiple steps for someone to go through, which Judge Woodcock characterized in one form or another as always creating an exigent circumstance because it's going to simply take too long using their procedure to get the warrant in the first place. These key factual findings are important because the government bears the burden of proving the exigent circumstances and that here that they were pressing health, safety, and law enforcement needs. Let's just talk about the health part first. Mr. Menabolo. Before you do that, could you just explain? I thought that if the first USAG had picked up, that would have been enough. If the person had picked up, then that person could have made the phone call to the magistrate judge to get the warrant. It's not that the process is so cumbersome. It's just that it broke down that evening, isn't it? Sure, but the process that Ranger Dominick testified was that there would be a call that would be made, and then he would physically drive back to his office, sit down, and type up a warrant, and then submit it back to the AUSA, who would then get in touch with the magistrate at the time. There was no direct route to the magistrate, and as the court indicated here in the questions before, oftentimes law enforcement officers have the free ability. There's nothing in the rule that says that they cannot contact the magistrate judge themselves. They may not do that here, but that's not the problem of the defendant. That's the problem of the process, but the U.S. Attorney's Office set up and apparently was the view of the prior magistrate, not the magistrate that was actually on duty, so to speak, that night. In that circumstance, if you actually followed all those steps, it would have been at least two or three hours. But remember, too, it wasn't just one AUSA didn't pick up. It was two, and it was only on the third try that an AUSA actually was reached, and that AUSA tried to reach the first one, and it was almost an hour later before that AUSA, the one who was on call, finally picked up. I would suggest to the court that the third AUSA at that point might have taken some steps if they had decided to do so instead of saying, I'm going to wait to see if the original on-call AUSA thinks it's important enough to call back. In essence, at that point, they could have gone ahead and done whatever they were going to do, as slow as it may have been. But back to Mr. Manabolo's injuries, if I may. These were minor. He had a goose bump under his eye, and he had cuts and scratches, and that was consistent with somebody even involved in an accident. Mr. McKee, if I might interrupt a bit to frame the issue that's on my mind, it really has to do with incentive structure, I suppose. If we view this process of exigent circumstances as kind of inviting triage or permitting triage by the law enforcement officers of the various things that they have to do, and they have to make judgments about whether or not they do one thing before they do another thing, then really what's involved here is can they get a blood draw in a reasonable amount of time, or are they making it so difficult for themselves that they won't be able to get a reasonable blood draw in a reasonable amount of time. They got one before 7 o'clock, which I guess was the kind of witching hour for this, or at least the parties seem to agree that it's the witching hour for this. The agent had before him not just scrapes and bumps, but also a concern about head trauma. He's balancing all of these factors, makes a judgment, and we have an incentive structure to get this done in a timely enough fashion so that they're able to get a blood draw that is reasonable. Why should we be second-guessing under those circumstances in this fashion? Well, the factual findings here were actually that the injuries were minor. There was a suggestion on the record there could be a head trauma or whatever, but Judge Woodcock did not see it that way. Remember, Mr. Manabolo in the evidence was somebody who, when they arrived at the scene, was walking, talking, and communicating. But didn't the EMT say this fellow has to go to the hospital or should go to the hospital? For an assessment. This is not a situation where there's a treatment like, we need to treat this person right off the bat. He's going one way or the other. We need to have an assessment done. And remember, they sent him over to the hospital for that assessment. They could have gone down to the Bar Harbor Police Department, which was, we know from the record, merely minutes away for an intoxilizer test. And that intoxilizer test, which Mr. Manabolo, there was no suggestion that he could not have physically done it, could have taken the intoxilizer test and then had the assessment done later. That's why Judge Woodcock— But isn't that—I don't mean to interrupt you. I'm sorry. But isn't that really part of that kind of incentive structure? That is, they choose to get a—for whatever reason, they choose to get a blood draw as opposed to a breathalyzer. And while breathalyzers at police stations are better than they are on the road, someone may, an agent, a skilled agent, may look at that and say, I don't want a breathalyzer. I want a blood draw on this. And so he balances all of these factors. Now, back to that larger question of what findings were made by Judge Woodcock on these issues, he didn't find one way or the other, did he, about whether or not there was a need to go to the hospital? No, he didn't. What he found was that the injuries were minor, and he described them, and he described them in a way that would be consistent with any accident. And I suggest that this accident here was no different than any other OUI accident that happens in the state of Maine on any given night, unfortunately. Do most of them involve three fatalities? Well, the fatalities are— See, I guess the point is that there are a lot of unknowns, and so we're leaving it to the agent to triage, and that's why I'm trying to get to this larger question. But can I ask just one other question? I'm sorry to keep interrupting you, but that goes to that 7 o'clock idea. Ms. Lopez tells us that both of you agree that the blood draw by the hospital for its own clinical purposes is different from the blood draw that was done at the direction of the agent, and I'm not sure I understand what that really means. It was done by the same nurse. It takes a—presumably gets a specimen, same specimen. What's the difference between them? What makes one more vulnerable than the other? Sure, the blood draws that are done by nurses who are conducting that kind of draw pursuant to Maine standards have to follow, and the analysis is done, in a whole separate process for forensic toxicology. Is that somewhere that we can find in the record that tells us the difference? Because it strikes me that she probably thinks she's doing the same thing when she draws blood. They're two separate processes, and we don't have anything in the record. The reason this became an issue was because the government indicated, look, regardless of whether we're going to use the hospital blood sample, we are going to seek to admit this sample. And when the government said they were going to do that, well, we had to litigate the issue. They weren't going to say, well, we'll just skip this issue. We don't even need to deal with the police blood draw. We'll just use the hospital blood draw. Isn't this then going to come back at a later point, not just at the suppression point, but at the point of whether or not on a motion in limine or however the judge says, I'm not going to permit the use of the blood draw from the hospital, or says, I am going to permit the blood draw from the hospital using the government's expert. But the point is this suppression isn't the final step in this process. No, it isn't. That other sample will be litigated. We haven't done that because it wasn't a constitutional dimension, the hospital piece, and we're just going to have to address that when it comes up. I think there was some reference in one of the Chambers conferences to we'll deal with that in a motion in limine. I do want to talk about law enforcement availability. This was not a situation like we see in Schmerber or maybe other cases where we have a single officer there who has to make quick decisions about what needs to be prioritized. This was a static accident scene. In essence, and I appreciate the court's observation, this was a triple fatality. But when it comes to the OUI accident, we have the vehicle in the woods. We have Mr. Manabolo there. The other occupants in the vehicle are deceased. There's no other witnesses to be interviewed at the scene at the time. The scene is actually blocked off. We have three Bar Harbor Police Department officers there and a Southwest Harbor police officer who's blocking off the scene up above the park road. This scene is not going anywhere. There's no rain or storm that's coming in that's going to wash anything away. Ranger Domedy could very much, or any other officer, fully stepped away from the entire process, left it as it was, get the search warrant, and then come back and deal with it. It wasn't going to go anywhere at the time, not to mention there are three EMTs on the scene as well. So this was a scene that, as much as it's been said, it's been the middle of the night where there was an incredible response by law enforcement, an emergency such that the investigation piece is one that really has been taken care of in a manner that doesn't really make any exigencies. What do you say? Ms. Lopez argued that as far as the time within which a blood test needed to be taken in order to be meaningful, we can rely, and the district court should have relied, on either common knowledge or what the Supreme Court has said in Mitchell and other cases in observing the factual issue of how fast it dissipates. I don't think that we have a number for that, and I think that's an important piece. The government certainly could have presented that evidence. I think they did that in the Hutchinson case that Judge Hornby decided, where they had somebody that came in and talked about dissipation rates. But importantly, I think what Judge Hornby decided in the Hutchinson case was that wasn't information that was available to the law enforcement officer at the time. There's no evidence where this officer says, you know what, by 7 o'clock, there's no way that a government expert can do the retrospective analysis to say, well, .10 here must have been .12 here, or take into account the ability of the body to absorb alcohol and all these other different factors. None of that is in the record. These officers are trained in OUI detection and investigation. They could have testified about that. Any one of them could have, but they didn't. There's no record evidence on that, and that's important here because we need to know that number. Now, look, the failure of the U.S. Attorney's Office, I understand and appreciate that. It's not comfortable to talk about that. People didn't pick up the phone. But I think that we can almost take that part out of it because, as the court indicated, officers can make a phone call to a magistrate judge, and simply because the process has been set up where the AUSA has to approve everything and is the gatekeeper, shouldn't change that at all. That phone call can be made. Let me take you back to the dissipation point. Assume we have circumstances here where an officer has a triple fatality car accident. That's pretty serious, obviously, I would agree. And he knows that the driver had been drinking some, but he doesn't know exactly when the driver stopped drinking. So he knows there's dissipation occurring. He's not sure how much time he has before the dissipation will render the results meaningless. So is it reasonable under those circumstances for the officer to say, rather than taking a risk that I'll get no meaningful results, I'm going to draw it now rather than waiting three hours to get a warrant? Well, Your Honor, I think that would call into question whether in any situation, whether a warrant process is even going to be available or appropriate. It could be 15 minutes, and the officer could say, well, all of these situations, an hour, two hours, three hours, we're going to have dissipation. And certainly what the cases have told us is that that's not appropriate, dissipation alone. These other factors here are important and key factors. Just in mentioning the government and how they addressed the issue with respect to the warrant, it was difficult to understand what the issue was at all. Ranger Dominey may not have known the process to go through to do this in the first place, to make a phone call. They may have set up a situation where he did not have direct access to the magistrate. But again, those are processes, all of which are fully available, and frankly, to the state court officers as well, and they just decided not to do that. We don't really do that here. That's not the process. That's not the policy. We heard that time and again in the testimony. And simply because they don't avail themselves of the process doesn't all of a sudden create, well, there must be exits in circumstances because we just don't really know how to do it that way. And so last, Your Honor, I would indicate that the officers were certainly operating, I think, under the idea that they had the ability to use the main statute, which says you can compel these tests in the first place. You don't need to have anything else at all. And that's what Rager Dominey says basically to the Bar Harbor officer. Go do whichever you're going to do. And that officer says, I'm just down here. I'm going to take it because I can under main law that we know from Judge Woodcock's decision, which has not been challenged by the government, was unconstitutional. So that's all I have. Thank you very much. I appreciate it. I'm happy to answer any further questions with the minimal amount of time I might have available. Any additional questions? Thank you, Mr. McKee. Thank you, Mr. McKee. You can mute your audio and video at this time. Attorney Lopez, you have a three-minute rebuttal. Please reintroduce yourself on the record. Thank you. Julia Lopez on behalf of the United States. I would like to address three of the points that the court was just discussing with Mr. McKee. The first is Mr. Manabolo's injuries. We agree that the visible injuries were minor, but the district court did find that the officers agreed that he should go to the hospital because of the advice of the EMTs, and I would submit that it would be unreasonable to suggest that the officers should have first diverted him to the police department for a breath test, given the catastrophic nature of this accident. His three passengers were dead. The officers testified that he had indications of head trauma. He appeared to be in shock or have trouble with his short-term memory. The EMTs wanted him to be evaluated for internal injuries. Under those circumstances, the question is always reasonableness. It was reasonable for the officers to have him go to the hospital first and not be diverted for a breath test, and that is a critical fact when we're looking at exigent circumstances under the Mitchell case. The second point I would like to discuss is the nature of the warrant process. There's a state process. There's a federal process, and I would submit that this, again, goes back to my point that if a warrant process works the vast majority of the time but it is too slow in a case like this, it doesn't mean that you've set up a process that's deficient under the Fourth Amendment. Even in McNeely, the court acknowledged that... What does that mean? I don't understand what that means. You say too slow in a case like this. Why is this case different from any other case or any other case involving an accident? Well, if you look at the totality of the circumstances, Judge Thompson, we're in a remote area. We have limited law enforcement resources. But the area, as Mr. McKee said, was static at that point. I mean, the only thing that was moving was the defendant. Remote area in the sense, Your Honor, that, for example, the state justice of the peace lived 45 minutes away, and you have limited officer resources. This didn't happen in the middle of Portland where you might have 10 federal agents who could quickly respond to the scene, and you could send one off to get a warrant. So when you're looking at the totality, I think we need to look at the location, the time... Every federal agency, law enforcement agency, has cooperation agreements with state actors, and they were on the scene. That's correct, Your Honor, but the state officers under the federal rules can't go swear out a federal warrant. So I think in terms of looking at the warrant process, we have to separate them out. We have one federal officer on scene. He's the only one who's capable of swearing out a federal warrant. But they can get a state warrant. Excuse me? They can get a state warrant. Right, and the district court found that that would have taken between 3 and 5 hours given the process as it existed. The justice of the peace was 45 minutes away. They didn't have the ability to print out affidavits. They were under the process as they understood it required to use written affidavits. And I would just like to go back to the McNeely decision because what the court said there is that even with standard DUIs, exigency may arise in the regular course of law enforcement because of the warrant process as it exists in some jurisdiction. There was nothing in McNeely that suggested that if you don't have a warrant process that can be accomplished in one hour... Time has expired. ...you're going to have a problem. And so I would suggest that the court look at McNeely and that the warrant process here was not unreasonable under the Fourth Amendment. Thank you. Thank you. That concludes argument in this case. Attorney Lopez and Attorney McKee, you should disconnect from the hearing at this time.